IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| TCW/CAMIL HOLDING L.L.C., | ) | |
| | ) | Case no. 03-10717 (MFW) |
| Debtor. | ) | |
| —————————————— | ) | |
| | ) | |
| TCW/CAMIL HOLDING L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 03-1154-SLR |
| | ) | |
| FOX HORAN & CAMERINI L.L.P., | ) | |
| | ) | |
| Defendant. | ) | |

Stuart M. Grant, Esquire and Lauren E. Wagner, Esquire of Grant & Eisenhofer, P.A., Wilmington, Delaware.  Counsel for Plaintiff.

Ian Conner Bifferato, Esquire and Joseph K. Koury, Esquire of Bifferato, Gentilotti & Biden, Wilmington, Delaware.  Counsel for Defendant.  Of Counsel:  Thomas W. Hyland, Esquire, Richard E. Lerner, Esquire, and Joseph L. Francouer, Esquire of Wilson, Elser, Moskowitz, Edelman & Dicker L.L.P., New York, New York.

**OPINION**

Dated:  August  24 , 2005
Wilmington, Delaware

ROBINSON, Chief Judge

## I.   INTRODUCTION

On March 10, 2003, plaintiff TCW/Camil Holding L.L.C. filed
for protection from its creditors under Chapter 11 of the United
States Bankruptcy Code in the United States Bankruptcy Court for
the District of Delaware.  (D.I. 76 at 133-35, 183)  Plaintiff
subsequently filed an adversary complaint in the bankruptcy court
alleging defendant Fox Horan & Camerini L.L.C. committed legal
malpractice in the course of representing plaintiff.  (D.I. 1,
Ex. A)  Defendant moved to withdraw reference of the adversary
proceeding from the bankruptcy court, which motion was granted on
January 21, 2004.  (D.I. 1, 6)  The court conducted a bench trial
in November of 2004.[1]  (D.I. 75-77)  The following constitutes
the court's findings of fact and conclusions of law pursuant to
Fed. R. Civ. P. 52(a).

## II.  FINDINGS OF FACT

### A.   Relevant Entities and Representatives

1.   Camil Alimentos S.A. ("Camil Alimentos") is a
corporation organized under the laws of the Federative Republic
of Brazil, and is the second largest producer and distributor of
rice in Brazil.  (D.I. 69 at 3; D.I. 75 at 39-40)

2.   Camil Holdings, L.L.C. ("Camil Holdings") is a

---

[1]The court denies plaintiff's motion for sanctions against
defendant under Fed. R. Civ. P. 11 for making allegedly false and
misleading statements in connection with the expert report of
Joseph M. Perillo.  (D.I. 74)

limited liability company organized under the laws of Delaware.
(D.I. 69 at 3)  Camil Holdings functions as a holding company for
all of the shares of Camil Alimentos.  (D.I. 75 at 37; CX 1)[2]

3.    Plaintiff TCW/Camil Holding L.L.C. is a limited
liability company organized in December 1998 under the laws of
Delaware.  (D.I. 69 at 2)  Plaintiff was formed by TCW/Latin
America Private Equity Partners, L.P. ("the Fund") to hold the
Fund's units in Camil Holdings.[3]  (D.I. 75 at 35-36; CX 1)

4.    Garial S.A. ("Garial") is a corporation organized
under the laws of Panama.  (D.I. 69 at 3; PX 1 at 1)[4]  Garial
functioned as a holding company for all the Camil Holdings units
owned by the Camil Alimentos management.  (D.I. 75 at 36; CX 1)

5.    IRHE Holdings, Inc. ("IRHE") is a corporation
organized under the laws of the Cayman Islands.  (PX 1 at 1)
IRHE was an investment vehicle controlled by a personal family
bank from Argentina called Perez Companc.  (D.I. 75 at 36-37, 40)
IRHE held all of Perez Companc's units in Camil Holdings.  (D.I.
75 at 39-40)

_____

[2]"CX 1" refers to Court Exhibit 1, which was submitted by
plaintiff.  (D.I. 77 at 208)

[3]Since Camil Holdings is a limited liability company, it
issues units instead of shares.  (D.I. 26 at 3 n.4)

[4]"PX __" refers to exhibits submitted by plaintiff at trial.
For example, "PX 1" would be plaintiff's exhibit number 1 at
trial.

6.    Josapar S.A. ("Josapar") is the largest producer and distributor of rice in Brazil.  (D.I. 75 at 39-40; PX 1)

7.    Carlos Christensen ("Christensen") has over 30 years of financial experience as a banker.  (D.I. 75 at 31)   In April of 1996, Christensen "joined forces" with Mario Baeza ("Baeza") to develop the Fund.  (Id. at 32)  Christensen held many different positions in plaintiff and its related companies. (Id. at 34)  Christensen characterized himself as a sophisticated businessman in the South American market.  (D.I. 75 at 86)

8.    Carol Baldwin Moody ("Moody") was in-house counsel for plaintiff and Camil Holdings.  (D.I. 76 at 5)   Moody graduated with a Bachelors of Science degree in economics from the Wharton School and a Juris Doctor from Columbia Law School. (D.I. 76 at 3-4)  After she left law school, she worked for six years as a corporate law associate at Debevoise & Plimpton. (D.I. 76 at 4)  Moody had no experience with litigation or arbitration at the time of the transaction at issue.  (D.I. 76 at 5, 36)

9.    Defendant Fox Horan & Camerini L.L.P. is a law firm and a limited liability partnership registered in the State of New York.  (D.I. 69 at 2)  Plaintiff, Garial and Camil Holdings retained defendant to represent each of the three entities in an arbitration and post-arbitration proceedings. (D.I. 69 at 3; D.I. 75 at 63, 66; D.I. 76 at 18)

3

10.   Eduardo Tabio ("Tabio") was a partner at defendant.   Tabio was primarily responsible for supervising defendant's day-to-day work on behalf of plaintiff, Garial and Camil Holdings.   (D.I. 75 at 66-68, 73)   Tabio experienced personal problems during defendant's representation of plaintiff, Garial and Camil Holdings.   (D.I. 77 at 102-03)

11.   Eric Lindquist ("Lindquist") was primarily responsible for drafting and revising documents, and handling arguments on behalf of plaintiff, Garial and Camil Holdings. (D.I. 77 at 64, 180-81)   Prior to the arbitration proceedings at issue, Lindquist never worked on a complex investment fund or on an arbitration.   (D.I. 77 at 120, 181-82)

## B.   The Agreement

12.   Sometime in 1999, plaintiff, Garial, Camil Holdings and IRHE entered into negotiations to collectively attempt to acquire Josapar.   (D.I. 75 at 39-40; PX 1) Christensen participated in these negotiations on behalf of plaintiff and Garial.   (D.I. 75 at 42-43)

13.   On December 8, 1999 these negotiations culminated in an agreement ("the Agreement").   (D.I. 69 at 3; PX 1) Christensen also participated in the drafting of the Agreement. (D.I. 75 at 43)

14.   The Agreement provides that Camil Alimentos would enter into a series of transactions with individual shareholders

4

of Josapar to acquire at least 50.1% of Josapar's total issued and outstanding stock.  (D.I. 75 at 43; PX 1 at 1)

15.  IRHE agreed to invest cash in Camil Holdings equal to the amount that Camil Alimentos agreed to pay for the stock of Josapar.  (D.I. 75 at 43; PX 1 at 2)  Camil Holdings would then issue "New Camil Units" to IRHE in an appropriate percentage of Camil Holdings' total issued and outstanding units.  (PX 1 at 2)

16.  Pursuant to Section 2(C) of the Agreement, if Camil Alimentos failed to acquire a controlling interest in Josapar within twelve months of the Agreement (the "Acquisition Period"), then IRHE could request that plaintiff, Garial and Camil Holdings enter good faith negotiations with IRHE to adjust IRHE's interest in Camil Holdings to reflect the value of Camil Holdings without control of Josapar.[5]  (D.I. 75 at 45-46; PX 1 at 2)

17.  Section 2(C) of the Agreement also states that in the event Camil Holdings did not obtain control of Josapar and good faith negotiations between plaintiff, Garial, Camil Holdings and IRHE did not produce an agreement on IRHE's adjusted interest in Camil Holdings, then plaintiff and Garial agreed "to cause" Camil Holdings to repurchase IRHE's New Camil Units for the amount IRHE invested in Camil Holdings.  (PX 1 at 3)

---

[5]On April 17, 2000, the Agreement was amended to extend the Acquisition Period to March 31, 2001 ("the Amended Acquisition Period").  (PX 2 at 1)

18.   The Agreement also provides that disputes between the parties regarding the terms of the Agreement would be submitted to arbitration for final and binding resolution.   (PX 1 at 8)

19.   During negotiation of the Agreement, IRHE asked plaintiff and Garial to guarantee Camil Holdings' repurchase of the New Camil Units.   (D.I. 75 at 50-51, 86-87, 91, 99; D.I. 77 at 137)   Plaintiff and Garial refused to give IRHE a guarantee. (D.I. 75 at 50-51, 86-87, 91, 99; D.I. 77 at 137)

C.   **Implementation of the Agreement**

20.   Pursuant to the Agreement, IRHE contributed $10 million to Camil Holdings in exchange for a 13% equity interest in Camil Holdings.[6]   (D.I. 69 at 4; D.I. 75 at 46)   Plaintiff and Garial each had a 43.5% equity interest in Camil Holdings.   (D.I. 69 at 4)

21.   Camil Holdings was only able to purchase 18% of Josapar during the Amended Acquisition Period.   (D.I. 75 at 46, 53)

22.   In an April 6, 2001 letter, IRHE requested that plaintiff, Garial, Camil Holdings and IRHE enter into good faith negotiations to adjust IRHE's interest in Camil Holdings.   (PX 3)

23.   Marcelo Diaz of IRHE informed Christensen that

_____

[6]IRHE invested a total of $10.4 million in Camil Holdings, however, $400,000 of this was used for administrative expenses. (D.I. 69 at 4)

IRHE did not want to adjust its interest in Camil Holdings.
(D.I. 75 at 53)  Rather, IRHE wanted plaintiff, Garial, or Camil
Holdings to repurchase IRHE's New Camil Units.  (D.I. 75 at 53;
D.I. 83 at 7)

        24.  In a May 15, 2001 letter, TCW/Latin America
Partners, L.L.C., the managing general partner of the Fund,
informed IRHE that plaintiff, Garial and Camil Holdings would be
available for the requested good faith negotiations during the
first week of June 2001.  (PX 4)

        25.  At the time of IRHE's request, plaintiff, Garial
and Camil Holdings did not have the funds or available means to
repurchase IRHE's New Camil Units.  (D.I. 75 at 58, 115-116, 122-
23; D.I. 76 at 12-13, 23, 84, 182-83; DX 138 at TCW8580)[7]

        26.  Plaintiff undertook efforts to assist Camil
Holdings in locating a source of funds to repurchase IRHE's New
Camil Units.  (D.I. 75 at 57-58)

        27.  Plaintiff's representatives also attempted,
unsuccessfully, to locate and negotiate with numerous strategic
investors (e.g., Riviana, ConAgra, Darby, Calvo and Josapar) for
an equity infusion in Camil Holdings to replace IRHE as an
investor.  (D.I. 75 at 57-58; D.I. 76 at 177-78)

        28.  On November 12, 2001, IRHE provided plaintiff and

---

        [7]"DX __" refers to exhibits submitted by defendant at trial.
For example, "DX 138" would be defendant's exhibit number 138 at
trial.

Garial with the necessary instructions to pay IRHE $10 million as
the repurchase price of IRHE's New Camil Units.  (PX 5)

### D.    Initiation of the ICC Arbitration Proceedings

29.  On January 22, 2002, IRHE notified plaintiff and
Garial that it intended to commence an arbitration.  (PX 7)  IRHE
indicated its intent to ask the arbitral tribunal to order
plaintiff and Garial to either:  (1) cause Camil Holdings to
repurchase IRHE's New Camil Units; or (2) purchase the New Camil
Units themselves.  (D.I. 75 at 61; PX 7 at FHM006032)

30.  On January 24, 2002, IRHE filed a Request for
Arbitration (the "Arbitration") against plaintiff, Garial and
Camil Holdings with the International Chamber of Commerce ("ICC")
International Court of Arbitration (the "Arbitral Tribunal").
(D.I. 69 at 3; PX 8)  IRHE initiated the Arbitration to resolve a
dispute over the obligations owed to it by plaintiff, Garial and
Camil Holdings under the Agreement.  (D.I. 69 at 3)

31.  In its Request for Arbitration, IRHE alleged that
plaintiff was in breach of Section 2(C) of the Agreement because
it failed "to cause" Camil Holdings to repurchase the New Camil
Units.  (PX 8 at FHC003259)

32.  When Moody received the Request for Arbitration,
she immediately sought outside counsel.  (D.I. 76 at 17)  Moody
never considered handling the Arbitration herself because she did
not have any experience with arbitrations and because she "had a

8

lot of other things on [her] plate that were occupying her time."
(Id.)

33. Moody met with defendant to discuss the possibility of its representing plaintiff in the Arbitration. (Id. at 18)

34. On February 14, 2002, defendant sent Moody a letter describing its background. (PX 9) This letter described defendant's attorneys as "experts in international corporate and litigation matters." (D.I. 76 at 18; PX 9 at FHM005472) Defendant also indicated that various partners of the firm "had substantial experience in arbitration matters brought before various arbitration associations." (PX 9 at FHM005472)

35. John Horan, a named partner at defendant, testified at trial that defendant was an expert in international corporate litigation matters. (D.I. 77 at 84)

36. Plaintiff, Garial and Camil Holdings retained defendant to represent each party's interest in the Arbitration and then later in post-Arbitration proceedings. (D.I. 69 at 3; D.I. 75 at 63, 66; D.I. 76 at 18)

**E.   Development of Plaintiff's Arbitration Strategy**

37. After plaintiff, Garial and Camil Holdings retained defendant, Christensen and Moody met with Tabio and Lindquist to explain the negotiations and provisions of the Agreement. (D.I. 76 at 20-21)

38.   During this meeting, Christensen and Moody made
defendant aware of the "particular obligations of the parties and
who was liable to pay" and that this was a major concern for
plaintiff.  (D.I. 75 at 70, 73; D.I. 76 at 22-23, 28)  Lindquist
corroborated this testimony.  (D.I. 77 at 119, 190-91)

39.   Although Christensen and Moody made defendant
aware of the differing obligations of plaintiff, Garial and Camil
Holdings under Section 2(C) of the Agreement, the central issue
of the Arbitration and the focus of Christensen's and Moody's
discussions with defendant was on whether the parties engaged in
good faith negotiations.  (D.I. 75 at 69; D.I. 76 at 21; D.I. 77
at 138-39)

40.   Christensen and Moody also expressed concern to
defendant throughout its representation about whether plaintiff
would obtain enough time through the Arbitration to line up an
alternative investor.  (D.I. 77 at 129-30, 147)

41.   Lindquist testified that, from his earliest
involvement in the Arbitration, plaintiff, Garial and Camil
Holdings always represented that "we had to repurchase[]" IRHE's
New Camil Units.  (Id. at 138)

42.   Lindquist assumed from these references to "we"
that plaintiff, Garial and Camil Holdings all had the same
obligation.  (Id. at 189-91, 193-94)  According to Lindquist, "I
took what they said.  They were using a shorthand.  I used a

10

shorthand." (Id. at 191)

43. Lindquist did not go back to the Agreement to check on the obligations created by the "to cause" language in Section 2(C). (Id. at 186)

**F.   The Terms of Reference**

44. The proceedings before the Arbitral Tribunal were conducted pursuant to the International Chamber of Commerce Rules of Arbitration ("ICC Rules"). (D.I. 69 at 3, 4)

45. In accordance with the ICC Rules, the parties to the proceeding jointly drafted a Terms of Reference ("TOR") containing, among other things, a Statement of Agreed Facts and the Issues to be Resolved by the Arbitral Tribunal. (Id. at 4)

46. Counsel for IRHE authored the initial draft of the proposed TOR on May 28, 2002. (D.I. 77 at 183; PX 20)

47. After IRHE's counsel produced the initial draft of the proposed TOR, the TOR went through approximately eight iterations over the course of a few days before the final draft was submitted to the Arbitral Tribunal on June 4, 2002. (D.I. 77 at 126; DX 76)

48. Christensen and Moody both reviewed drafts of the proposed TOR. (D.I. 75 at 124-25, 147-48; D.I. 76 at 29-31, 37-38, 58-59, 126-129; PX 10; PX 15; PX 16)

49. On June 4, 2002, defendant and counsel for IRHE submitted a joint proposed TOR to the Arbitral Tribunal. (DX 76)

11

The proposed TOR defined "Respondents" as plaintiff, Garial, and Camil Holdings.  (Id. at 2-3)  The proposed TOR also identified as an issue to be resolved whether "Respondents" were required to repurchase IRHE's New Camil Units.  (Id. at 11)

50.  On July 3, 2002, the Arbitral Tribunal executed the TOR (the "Final TOR").  (PX 31)  The Final TOR defined "Claimant" as IRHE and "Respondents" as plaintiff, Garial and Camil Holdings, collectively.  (D.I. 69 at 5; PX 31 at 2-3)

51.  Article 5.15 of the Final TOR provided that "Pursuant to Section 2(C) of the Agreement, in the event that Claimant and **Respondents** fail to agree on the value of Camil Holdings with a minority interest in Josapar within the Negotiation Period, **Respondents** agree to repurchase Claimant's New Camil Units."  (D.I. 69 at 5; PX 31 at 6-7) (emphasis added)

52.  Article 8.1 of the Final TOR requests the Arbitral Tribunal to resolve whether "**Respondents** breach[ed] Section 2(C) of the Agreement by failing to repurchase Claimant's New Camil Units[.]"  (D.I. 69 at 5; PX 31 at 12) (emphasis added)

53.  Article 8.2 of the Final TOR requests the Arbitral Tribunal to resolve whether "Claimant [is] entitled to an order requiring **Respondents** to repurchase Claimant's New Camil Units in the amount of $10 million or, in the alternative, to pay Claimant $10 million in exchange for Claimant releasing its New Camil Units[.]"  (D.I. 69 at 5; PX 31 at 12) (emphasis added)

12

54.  Defendant did not present any evidence or argument to the Arbitral Tribunal that plaintiff had only an obligation "to cause" Camil Holdings to repurchase IRHE's shares, and not an obligation itself to repurchase IRHE's shares.  (D.I. 77 at 194, 196-98, 200)

**G.   The Final Award and Judgment**

55.  On November 12, 2002, the Arbitral Tribunal rendered its decision (the "Final Award").  (PX 33)

56.  Shortly after the issuance of the Final Award, Tabio resigned from Fox Horan.  (D.I. 76 at 40-42; D.I. 77 at 102)

57.  In the Final Award, the Arbitral Tribunal found plaintiff, Garial and Camil Holdings jointly and severally liable for an award in favor of IRHE in the amount of $10 million, plus interest from December 6, 2001 up to and including the date of payment at the rate of nine percent per annum, plus 75% of the administrative expense and arbitrators' fees, as well as one half of IRHE's attorneys fees and costs from the Arbitration.  (D.I. 69 at 6; PX 33 at 13)

58.  On December 12, 2002, Moody, Christensen, Lindquist and other representatives of plaintiff, Garial, Camil Holdings and defendant conducted a telephone conference to discuss the Final Award.  (D.I. 76 at 89)

59.  At this telephone conference Paul Silverman, a

13

bankruptcy lawyer retained by plaintiff, identified the
discrepancy between the language of Section 2(C) of the Agreement
and the language of the TOR.  (Id. at 89-90; D.I. 77 at 148-49,
191-92)

60.  On December 16, 2002, defendant requested
clarification of the Final Award (the "Request for
Clarification").  (PX 35)  The Request for Clarification stated
that Section 2(C) of the Agreement imposed on Camil Holdings
alone the direct obligation to make payment for the New Camil
Units and that, pursuant to Section 2(C), plaintiff and Garial
were only required "to cause" Camil Holdings repurchase, rather
than to make payment directly.  (PX 35 at FHM006782)  Lindquist
signed the Request for Clarification.  (D.I. 75 at 78)

61.  On December 20, 2002, IRHE filed an Answer to the
Request for Clarification (the "Answer").  (PX 58)  In the
Answer, IRHE argued that the Request for Clarification attempted
to insert a new argument into the Arbitration after the Arbitral
Tribunal had already rendered a Final Award.  (PX 58 at 2)

62.  According to the Answer, "Respondents stipulated
to the fact that the payment obligation under Section 2(C) of the
Agreement lies with each of the three Respondents."  (PX 58 at 2)

63.  On December 23, 2002, IRHE filed a Petition to
Confirm the Arbitral Award and to Enter Judgment in Favor of IRHE
in the United States District Court for the Southern District of

14

New York (the "Petition to Confirm").  (D.I. 69 at 6)

64.  On January 17, 2003, defendant filed a motion to dismiss or stay the Petition to Confirm.  (PX 40)  Defendant argued, "[t]he conflict between TOR Article 5.15 and Article [2](C) of the Agreement is irreconcilable, and it goes to the very heart of Respondents' obligations under the very terms of the Agreement that were in dispute."  (Id. at 3-4)

65.  On January 20, 2003, defendant and representatives of plaintiff, Garial and Camil Holdings participated in a conference call.  (D.I. 75 at 80)  At this meeting, Lindquist admitted that he made a mistake in failing to distinguish the responsibilities of plaintiff, Garial and Camil Holdings.  (D.I. 75 at 80; D.I. 76 at 48-50, 125-126; D.I. 77 at 152-54)

66.  On January 29, 2003, the Arbitral Tribunal denied defendant's Request for Clarification.  (PX 37)

67.  Relying on Articles 5.15 and 8.1 of the Final TOR for its finding that plaintiff, Garial and Camil Holdings were jointly and severally liable for the repurchase of IRHE's New Camil Units, the Arbitral Tribunal noted that it decided the issues in the manner framed by the parties.  (Id. at FHC000330)

68.  The Arbitral Tribunal also noted that when parties sign a TOR without reservation, these statements may constitute binding commitments by the parties complimentary to the arbitration agreement.  (Id.)

15

69.  On February 13, 2003, the Southern District of New York entered an order confirming the Final Award of the Arbitral Tribunal.  (D.I. 69 at 6)

70.  On March 10, 2003, IRHE began execution proceedings in the Southern District of New York against plaintiff for the full amount of the judgment.  (Id. at 6; D.I. 76 at 133-34)

71.  IRHE subsequently withdrew its execution proceedings on March 10, 2003, because the proceedings had been commenced prematurely by one day.  (D.I. 69 at 6; D.I. 76 at 133-34)

72.  On March 10, 2003, plaintiff filed for protection from its creditors under Chapter 11 of the United States Bankruptcy Code in the District of Delaware.  (D.I. 76 at 134-35, 183)

73.  Following TCW/Camil's bankruptcy filing, IRHE's collection efforts were automatically stayed pursuant to the Bankruptcy Code.  (D.I. 69 at 7)

74.  On June 17, 2004, plaintiff, Garial and Camil Holdings reached a settlement agreement ("the Settlement Agreement"), which called for plaintiff to secure:  (1) Camil Holdings' repayment of a $5.0 million loan at 18% interest per annum to ZaZa Holdings to fund the settlement; and (2) Camil Holdings' repayment of a demand note for the remaining amount of

16

IRHE's judgment.  (D.I. 76 at 141-42; PX 54, Exs. 1, 2, 4)

## III. CONCLUSIONS OF LAW

1.   The Agreement provided that New York law governs the application and construction of the Agreement.  (PX 1 at 8) The present matter arose from defendant's representation of plaintiff in the Arbitration to resolve rights under the Agreement.  The court concludes that New York law controls the present matter.[8]

### A.   Legal Malpractice

2.   Legal malpractice is a specific form of negligence. <u>Schweizer v. Mulvehill</u>, 93 F. Supp. 2d 376, 393 (S.D.N.Y. 2000).  A claim of legal malpractice consists of four elements:  (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual damage resulting from the professional's negligence.[9]  <u>Id.</u>; <u>Freschi v. Grand Coal Venture</u>, 564 F. Supp.

---

[8]Not only does the Agreement provide that it shall be governed and construed in accordance with the law of the State of New York, but the parties both agree that New York law applies to plaintiff's legal malpractice claim.  (D.I. 81 at 27; D.I. 83 at 29)

[9]In a previous order this court found a lack of any questions of fact as to whether plaintiff suffered actual damages.  (D.I. 26 at 16 n.9)  According to this court, "Under

17

414, 415 (S.D.N.Y. 1983); Tinter v. Rapaport, 677 N.Y.S.2d 325,
326 (N.Y. App. Div. 1998); Mendoza v. Schlossman, 448 N.Y.S.2d
45, 46 (N.Y. App. Div. 1982).

     3.    To prevail on a claim of legal malpractice, a
plaintiff must establish the failure of an attorney to exercise
the degree of skill commonly exercised by an ordinary member of
the legal community proximately resulting in damages to the
client.  Schweizer, 93 F. Supp. 2d at 393; Plentino Realty v.
Gitomer, 628 N.Y.S.2d 75, 76 (N.Y. App. Div. 1995); Saveca v.
Reilly, 488 N.Y.S.2d 876, 877 (N.Y. App. Div. 1985).

     **1.  Duty**

     4.    Existence of an attorney-client relationship
establishes the duty element of a legal malpractice claim.  M.J.
Woods, Inc. v. Conopco, Inc., 271 F. Supp. 2d 576, 583 (S.D.N.Y.
2003); Lucas v. Lalime, 998 F. Supp. 263, 268 (W.D.N.Y. 1998);
Wei Cheng Chang v. Pi, 733 N.Y.S.2d 471, 473 (N.Y. App. Div.
2001).

---

. . . Section 2(C) of the . . . Agreement, plaintiff was not
directly obligated to repurchase the New Camil Units from IRHE.
Plaintiff was only obligated 'to cause' Camil to repurchase these
units.  By holding plaintiff liable for more than $11.2 million,
plaintiff necessarily suffers actual damages."  (Id.)  This court
reserved determination of the extent of damages for proceedings
following a finding of liability.  (D.I. 64 at 17)  On April 18,
2005, plaintiff filed a motion for a trial date on the damages
phase of this case.  (D.I. 85)  Since the court finds defendant
liable for legal malpractice, it grants plaintiff's motion.  The
court will conduct a telephone conference for the purpose of
scheduling trial, consistent with the order issued in connection
with this opinion.

5.     There is no dispute that defendant represented plaintiff, Garial and Camil Holdings in the Arbitration and in post-Arbitration proceedings.  (D.I. 69 at 3; D.I. 76 at 17-18) Consequently, defendant owed plaintiff a duty to exercise the degree of skill commonly exercised by an ordinary member of the legal community through the course of its representation of plaintiff (the "Standard of Care").[10]

### 2.    Breach of duty

#### a.    Mistake

6.     Attorneys are entitled to discretion in determining which positions to advance on behalf of clients. Hatfield v. Herz, 109 F. Supp. 2d 174, 180 (S.D.N.Y. 2000).

7.     An attorney is not held to a rule of infallibility, and is not liable for an honest mistake of judgment where the proper course of action is open to reasonable doubt.  Id.; see also DaSilva v. Suozzi, English, Cianciulli & Peirez, 649 N.Y.S.2d 680, 683 (N.Y. App. Div. 1996).

---

[10]Testimony and trial exhibits suggest that defendant, in its representation of plaintiff, should be held to a higher standard of care than that of an ordinarily skilled lawyer. (D.I. 77 at 17-18, 84, 96-97; PX 9 at 2)  However, plaintiff failed to cite, and the court was unable to find, any precedent supporting the proposition that attorneys purporting to specialize in particular fields of law can be held to higher standards of care for work in those fields.  Furthermore, plaintiff did not identify a pertinent standard of care.  Because the court finds defendant breached the ordinary Standard of Care, it need not consider whether a heightened standard applies or whether such a heightened standard was violated.

8.   However, a mistake in judgment or discretion in determining how to advance a client's case requires some cognition of the position or argument. (D.I. 75 at 192; D.I. 77 at 24)  The evidence clearly shows that defendant did not even consider the argument that plaintiff only owed IRHE a duty "to cause" Camil Holdings to repurchase. (D.I. 76 at 89-90; D.I. 77 at 147-49, 191-92)  Thus, defendant's failure to present this argument cannot properly be called an honest mistake of judgment.

9.   The court concludes that, by failing to identify plaintiff's limited obligation to cause Camil Holdings to repurchase the New Camil Units from IRHE, defendant's actions fell below the Standard of Care owed to plaintiff. (D.I. 77 at 24)

### b.   Failure to Adequately Investigate

10.   Attorneys may be held liable for ignorance of the rules of practice, failure to comply with conditions precedent to suit, neglect to prosecute or defend an action, or failure to conduct adequate legal research. <u>Hatfield</u>, 109 F. Supp. 2d at 180; <u>Shopsin v. Siben & Siben</u>, 702 N.Y.S.2d 610, 612 (N.Y. App. Div. 2000).

11.   Failure to properly investigate, evaluate, and advise a client can also establish an attorney's failure to exercise the degree of skill commonly exercised by an ordinary member of the legal community. <u>Hart v. Carro, Spanbock, Kaster &</u>

20

<u>Cuiffo</u>, 620 N.Y.S.2d 847, 849 (N.Y. App. Div. 1995).

12.   Negligent or willful withholding of information material to the client's decision to pursue a course of action is also a breach of the duty of due care.  <u>Schweizer v. Mulvehill</u>, 93 F. Supp. 2d 376, 397 (S.D.N.Y. 2000).

13.   Expert testimony is generally relied upon to establish a breach of the standard of professional care.  <u>Green v. Payne, Wood & Littlejohn</u>, 602 N.Y.S.2d 883, 885 (N.Y. App. Div. 1993) ("expert testimony will be necessary to establish that the attorney breached a standard of professional care and skill"); <u>see also</u> <u>Schadoff v. Russ</u>, 717 N.Y.S.2d 284, 285-86 (N.Y. App. Div. 2000); <u>S & D Petroleum Co., Inc. v. Tamsett</u>, 534 N.Y.S.2d 800, 802 (N.Y. App. Div. 1988).

14.   Under New York law, the Code of Professional Responsibility (the "Code") is instructive in evaluating an allegation of legal malpractice.  <u>Rejohn v. Serpe</u>, 478 N.Y.S.2d 799, 801 (N.Y. Dist. Ct. 1984);[11] <u>see also</u> <u>Ayala v. Fischman</u>, No.

_____

[11]This court previously held that <u>Rejohn v. Serpe</u> was not controlling in determining whether a legal malpractice claim premised on a conflict of interest was cognizable.  (D.I. 26 at 18 n.11)  Instead, the court relied on <u>Sumo Container Station, Inc. v. Evans, Orr, Pacelli, Norton & Laffan, P.C.</u>, 719 N.Y.S.2d 223, 224 (N.Y. App. Div. 2000), which held, "The cited conflict of interest, even if a violation of the Code of Professional Responsibility, does not by itself support a legal malpractice cause of action."  (<u>Id.</u> at 18)  Based in part on the holding of <u>Sumo</u>, this court held "that plaintiff's legal malpractice claim based on said conflict of interest is not a justiciable ground for legal malpractice."  (<u>Id.</u> at 19)  This previous ruling dealt with use of a conflict of interest to establish malpractice, and consequently has no impact on the court's current use of the Code

97 Civ. 6698, 1998 WL 726005, at *3 (S.D.N.Y. Oct. 15, 1998)
(citing New York Code of Professional Responsibility to establish
a duty).   Although the Code was not written specifically for the
purpose of civil litigation, provisions of the Code, such as
those relating to competence and zeal, are relevant to
determining breach of the Standard of Care in legal malpractice
actions.   (D.I. 77 at 16)   The testimony of Professor Monroe
Freedman, an expert in New York legal ethics, corroborated this
conclusion.[12]   (D.I. 77 at 19-25)

    15.   However, violations of the Code do not, by
themselves, generate separate causes of action.   Brown v. Samalin
& Bock, P.C., 547 N.Y.S.2d 80, 81 (N.Y. App. Div. 1989).

    16.   Canon 6 of the Code relates to an attorney's duty
to be competent in representing a client.   (D.I. 77 at 18); see
also N.Y. Code of Prof'l Responsibility Canon 6 (2002).   Canon 6
forbids a lawyer to neglect a legal matter or give legal advice

_____

to determine malpractice.

   [12]Professor Bruce Green, also an expert in New York legal
ethics, testified that, in order to establish a standard of care,
plaintiff had to bring "forward an expert knowledgeable about
commercial litigation or arbitration, who would review the
argument that was not made, make some judgment about whether it
was a good argument, a bad argument, an obvious argument or a not
obvious argument." (D.I. 75 at 174)   Professor Green did not
testify as to whether defendant satisfied the Standard of Care it
owed plaintiff.   (Id. at 179)   While Professor Green identified
one potential way of determining a breach of the Standard of
Care, the court concludes that Professor Freedman's testimony
about defendant's violation of the ethical duty of competence and
zeal is at least instructive in the evaluation of an allegation
of negligence.

or services without research and preparation that is adequate for
the circumstances.  (D.I. 77 at 18-19); <u>see also</u> N.Y. Code of
Prof'l Responsibility Canon 6 (2002).

     17.  Canon 7 of the Code relates to an attorney's duty
to zealously represent a client.  (D.I. 77 at 19); <u>see also</u> N.Y.
Code of Prof'l Responsibility Canon 7 (2002).  Canon 7 requires a
lawyer to advance and protect the rights and interests of the
client, and do nothing to harm the client in the course of the
representation.  (D.I. 77 at 19); <u>see also</u> N.Y. Code of Prof'l
Responsibility Canon 7 (2002).

     18.  Christensen and Moody generally informed defendant
of the importance of the corporate structure of plaintiff, Garial
and Camil Holdings, and the differing obligations of these
entities.  (D.I. 75 at 70, 73; D.I. 76 at 22-23, 28; D.I. 77 at
119, 190)  Despite this, defendant assumed, without any
additional research or investigation, that plaintiff, Garial and
Camil Holdings had the same obligation to repurchase IRHE's New
Camil Units.  (D.I. 77 at 184-91, 193-94)  Defendant's failure to
adequately research and investigate plaintiff's obligation under
the "to cause" language of Section 2(C) of the Agreement violated
Canon 6 and Canon 7 of the Code.  (D.I. 77 at 19-25)  As a
result, defendant breached the Standard of Care it owed plaintiff
in these regards.  <u>Rejohn</u>, 478 N.Y.S.2d at 801; <u>see also</u> <u>Ayala v.</u>
<u>Fischman</u>, No. 97 Civ. 6698, 1998 WL 726005, at *3 (S.D.N.Y. Oct.

15, 1998).

19.   Independent of the Code, defendant breached the
Standard of Care it owed to plaintiff by not adequately
researching and investigating plaintiff's obligation under the
"to cause" language of Section 2(C) of the Agreement.   Carro, 620
N.Y.S.2d 849.

### 3.   Causation

20.   In order to establish the element of proximate
cause, the plaintiff must show that, but for the attorney's
negligence, what would have been a favorable outcome was an
unfavorable outcome.   Weil, Gotshal & Manges, L.L.P. v. Fashion
Boutique of Short Hills, Inc., 780 N.Y.S.2d 593, 596 (N.Y. App.
Div. 2004); Zarin v. Reid & Priest, 585 N.Y.S.2d 379, 386-87
(N.Y. App. Div. 1992).   The test is whether a proper defense
would have altered the result of the prior action.   Id.

21.   Under Section 2(C) of the Agreement, plaintiff was
obliged "to cause" Camil Holdings to repurchase the New Camil
Units.   (PX 1 at 3)

22.   Under New York law, the "essence of contract
interpretation . . . is to enforce a contract in accordance with
the true expectations of the parties in light of the
circumstances existing at the time of the formation of the
contract."   VTech Holdings Ltd. v. Lucent Techs., Inc., 172 F.
Supp. 2d 435, 441 (S.D.N.Y. 2001); see also Sunrise Mall Assocs.

24

v. Import Alley of Sunrise Mall, Inc., 621 N.Y.S.2d 662, 663
(N.Y. App. Div. 1995).  Indicators of intent are common speech
and the reasonable expectation and purpose of the ordinary
business person in the factual context in which the terms of art
and understanding are used.  Uribe v. Merchants Bank of N.Y., 670
N.E.2d 740, 743 (N.Y. 1998).

23.  As part of the negotiation of the Agreement, IRHE
asked for a guarantee from plaintiff of Camil Holdings'
performance.  (D.I. 75 at 50-51, 86, 91, 99; D.I. 77 at 137)
Plaintiff refused to give IRHE a guarantee.  (Id.)  Consequently,
the parties could not have intended or reasonably expected that
plaintiff would guarantee Camil Holdings' repurchase of IRHE's
New Camil Units.  Plaintiff's obligation "to cause" Camil
Holdings to repurchase IRHE's New Camil Units did not constitute
a guarantee.[13]

---

[13]Defendant cites Eastman Kodak for the proposition that
under New York law, a parent company's breach of an agreement "to
cause" its subsidiary to comply with the subsidiary's obligations
exposes the parent to the full amount of judgment against the
subsidiary.  (D.I. 83 at 29)  The court rejects defendant's
argument.  The Eastman Kodak court interpreted a contract in
order to determine a parent company's obligation "to cause" its
subsidiary to pay retirement benefit expenses.  232 F. Supp. 2d
74, 91 (S.D.N.Y. 2002).  The court identified common speech,
reasonable expectations, and the factual context as relevant
considerations in interpreting a contract's provisions.  Id.
Based on its interpretation of the "to cause" language in that
specific context, the Eastman Kodak court concluded that the
parent was liable for the subsidiary's failure to pay the
benefits.  Thus, Eastman Kodak does not stand for the proposition
that an entity's obligation "to cause" its subsidiary to perform
an obligation automatically exposes the entity to the full amount
of judgment against the subsidiary.

24.  Christensen, one of the negotiators of the
Agreement, testified that the parties to the Agreement understood
the words "to cause" to mean plaintiff would use reasonable
commercial efforts to facilitate Camil Holdings to meet its
obligation to raise money to buy IRHE's New Camil Units.  (D.I.
75 at 47-49)  According to Christensen, the whole point of the
"to cause" language was that, as a unitholder in Camil Holdings,
plaintiff would not oppose Camil Holdings' repurchase of IRHE's
units.  (D.I. 75 at 49-50)  Plaintiff's obligation under the "to
cause" language of Section 2(C) was to use reasonable efforts to
facilitate Camil Holdings' repurchase of IRHE's New Camil Units.

25.  Plaintiff undertook substantial efforts to find
liquidity for Camil Holdings.  (D.I. 75 at 57-58, 162-63; D.I. 76
at 177-78; DX 123 at 1-3)  The court concludes that plaintiff
satisfied its obligations under Section 2(C) of the Agreement.

26.  Defendant did not identify the differing
obligations of plaintiff, Garial and Camil Holdings under Section
2(C) of the Agreement as an issue to be resolved by the Arbitral
Tribunal.  (D.I. 77 at 194-98, 200; PX 31 at FHM005528-FHM005529,
FMH005532-FMH005533, FMH005538; PX 37; PX 58)  Defendant also did
not produce evidence indicating that plaintiff satisfied its
obligation "to cause" Camil Holdings to repurchase IRHE's New
Camil Units.  (D.I. 77 at 198)  The Arbitral Tribunal's Final
Award and its denial of defendant's Request for Clarification

indicate that it did not consider the different obligations of plaintiff, Garial and Camil Holdings in making its ruling. (D.I. 76 at 105; D.I. 77 at 194-98; PX 31; PX 33; PX 37) The court concludes that, had defendant not breached the Standard of Care it owed plaintiff, the Arbitral Tribunal would have found that plaintiff satisfied its obligation "to cause" Camil Holdings to repurchase IRHE's New Camil Units and the Arbitral Tribunal would not have concluded that plaintiff was jointly and severally liable for the entire award owed to IRHE.

**B.   Comparative Negligence**

27.   In appropriate circumstances, negligence of a client is a defense to a claim of legal malpractice. <u>Arnav Indus., Inc. Retirement Trust v. Brown, Raysman, Millstein, Felder & Steiner, L.L.P.</u>, 727 N.Y.S.2d 688, 691 n.2 (N.Y. App. Div. 2001) ("The culpable conduct of a plaintiff client in a legal malpractice action may be pleaded by the defendant attorney, by way of affirmative defense, as a mitigating factor in the attorney's negligence."); <u>Cicorelli v. Capobianco</u>, 453 N.Y.S.2d 21, 22 (N.Y. App. Div. 1982).

28.   A client's knowledge and sophistication may create a defense to legal malpractice. <u>Cicorelli</u>, 453 N.Y.S.2d at 22 (looking to the rulings of other jurisdictions to determine appropriate circumstances for considering a client's contributory negligence as a defense in a legal malpractice action). A client

27

who is a skilled lawyer, who is fully advised of issues involved, and decides what course of action to take may also be found to be contributorily negligent.  Id.  A non-attorney client may be contributorily negligent when it is reasonable to expect the client to understand the legal obligations or formalities notwithstanding erroneous advice from an attorney.  Id.

       29.  Christensen and Moody both have a high degree of knowledge and sophistication.  (D.I. 75 at 86; D.I. 76 at 3-4) Both Christensen and Moody reviewed several drafts of documents filed by defendant.  (D.I. 75 at 124-25, 147-48; D.I. 76 at 29-31, 37-38, 58-59, 126-129; PX 10)  However, Christensen is not a lawyer.  (D.I. 75 at 159)  Although Moody is a lawyer, she had no experience with litigation or arbitration and she had many other obligations which prevented her from focusing on the Arbitration. (D.I. 76 at 5-6, 17)  Furthermore, when Moody read defendant's drafts, she did so to see if they were factually correct, not to assess defendant's arguments.  (D.I. 76 at 5-6, 32)  Nothing in the evidence suggests that plaintiff limited defendant's representation or directed defendant on what arguments to make. (D.I. 75 at 74; D.I. 76 at 30)  Plaintiff hired defendant because of its familiarity with the Latin American region and its expertise in arbitration disputes.  (D.I. 76 at 18-20)  The court concludes that plaintiff was not contributorily negligent. Cicorelli, 453 N.Y.S.2d at 22 (finding that the plaintiffs, who

28

were sophisticated real estate developers, were not
contributorily negligent in a real estate transaction because
they hired defendant to represent them based on his superior
knowledge of the legal issues involved).

## IV.   CONCLUSION

For the reasons set forth above, the court finds that
plaintiff has established that defendant is liable for legal
malpractice and that plaintiff was not contributorily negligent.
An appropriate order shall issue.

29